[Cite as *In re C.O.*, 2015-Ohio-4290.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| IN RE: C.O. and D.O. | : | |
| | : | |
| | : | Appellate Case No. 26610 |
| | : | |
| | : | Trial Court Case Nos. 2013-2587 |
| | : | 2013-2588 |
| | : | |
| | : | |
| | : | (Civil Appeal from Common Pleas |
| | : | Court, Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of October, 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by DYLAN SMEARCHECK, Atty. Reg. No. 0085249, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Appellee-Montgomery County Children Services

CHARLES W. SLICER, III, Atty. Reg. No. 0059927, 111 West First Street, Suite 518, Dayton, Ohio 45402
      Attorney for Appellant-D.C.

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, D.C., father of C.O. and D.O., appeals from a judgment terminating his parental rights and awarding permanent custody of C.O. and D.O. to Montgomery County Children Services ("MCCS").[1]  Father contends that the trial court erred in granting permanent custody to MCCS because the agency failed to prove that permanent custody was in the children's best interests.  Father also maintains that MCCS failed to provide reasonable efforts prior to seeking permanent custody.  In addition, Father argues that the permanent custody proceedings violated his procedural and due process rights.  Finally, Father contends that his trial counsel was ineffective.

{¶ 2} We conclude that the award of permanent custody to MCCS was supported by sufficient competent and credible evidence.  We further conclude that Father waived error in the conduct of the proceedings below, other than plain error, by failing to raise any objections in the trial court.  There was also no plain error.  Finally, trial counsel did not render ineffective assistance.  Accordingly, the judgment of the trial court will be affirmed.

I.  Facts and Course of Proceedings

{¶ 3} On April 12, 2013, MCCS filed dependency complaints concerning Father's two minor children, C.O. and D.O., who were 11-year-old twins.  The twins had been in foster care in either Ohio or Kansas for six of the 11 years.

{¶ 4} The complaints alleged that the children were dependent under several grounds, including that they lacked adequate parental care based on their parent's or

---

[1] For purposes of convenience, we will refer to the parents as Father and Mother.

custodian's mental or physical condition; that their condition or environment was such to warrant the state in assuming their guardianship; and that they were residing in a household in which a parent, custodian, or guardian, or other member of the household had committed an act that was the basis for an adjudication that a sibling who resided in the household was an abused, neglected, or dependent child, and because of the circumstances surrounding the abuse, neglect or dependency of the sibling or other child and other conditions in the household, the child was in danger of being abused by the parent, custodian, guardian, or member of the household.

{¶ 5} MCCS initially became involved with C.O. and D.O. when another minor child of Mother was found wandering outside in the snow in January 2010, a block away from home. Previously, Mother had been convicted of four counts of Child Abuse (Intentional Torture) in Kansas, and had been in prison for those crimes from 1997 to 2000. She also lost permanent custody of three other minor children in 1997, due to the abuse.

{¶ 6} The complaints asked the court to adjudicate the children dependent and to grant a preferred disposition of permanent custody to MCCS pursuant to R.C. 2151.413; R.C. 2151.414(B)(1)(b) and (d) and (B)(2); and R.C. 2151.414(E)(1),(2),(4),(10),(14),(15), and (16). In addition, the complaints were accompanied by affidavits outlining essentially the same facts. On April 12, 2013, MCCS also filed a motion and affidavit for interim temporary custody at an ex parte hearing. The motion and affidavit were sent to Father at an address in Kansas City, Kansas. On the same day, MCCS filed an affidavit for service by posting, indicating that Father's last known address was the Kansas City address, and that diligent searches for other addresses had been unsuccessful.

{¶ 7} A shelter care hearing was held on April 15, 2013, and an attorney for Father

appeared on his behalf at the hearing. Father did not appear. The magistrate noted at the hearing that Father had no relationship with his sons and was not able to care for the children. Mother appeared at the hearing with counsel, and agreed to interim temporary custody to MCCS. A copy of the decision, which was filed on April 16, 2013, was sent to Father's attorney, and a copy of the decision was also sent to Father, at an address in Pittsburg, Kansas. An envelope was returned to the court, marked "Return to Sender," and "Not Here."

{¶ 8} Subsequently, on April 26, 2013, the court sent a summons to Father by certified mail, at the Kansas City address, summoning him to appear at an adjudicatory and/or dispositional hearing on June 4, 2013. See Case No. JC 2013-2588, Doc. #106. On April 29, 2013, Father's name was signed for the certified mail issued to that address. A notice was also posted on April 29, 2013, informing Father of the adjudicatory and dispositional hearing to be held on June 4, 2013.

{¶ 9} Father was represented by counsel at all times from the beginning to the end of the court proceedings. On May 17, 2013, the dependency hearing was continued until June 21, 2013. A copy of the entry continuing the hearing was sent to Father's counsel and to Father at the Kansas City address. On June 13, 2013, Father's counsel was given discovery materials by the State. The initial report of the Guardian Ad Litem ("GAL"), filed in June 2013, indicated that MCCS had been unable to make contact with Father after obtaining his phone number in October 2012. A copy of the GAL's report was sent to Father's attorney. The GAL recommended that permanent custody be granted to the agency based on the children's need for permanency.

{¶ 10} In the report, the GAL noted that Mother had been without permanent

housing since December 2010, became friendly with strangers very quickly, and was willing to place herself and her children at risk by moving in with people of whom she had no real knowledge. Her newest roommate was a man she met on August 28, 2012 at a dentist's office. Mother was living in his home full-time a few weeks later. She paid no rent, had no contract or legal agreement, and paid no bills at the home. This individual, R.M., said he had no long-term plans for her to live in his home.

{¶ 11} According to the GAL, a psychological report indicated Mother did not currently have the capability to independently parent her children. Mother had completed a parenting class and a class at Artemis, as well as parenting-related classes and intervention in Kansas, but seemed unable to implement things she had learned. Mother had been told of the need for a mental evaluation in June 2010, but had not begun it until February 2012. She also had no permanent employment since arriving in Dayton, Ohio, in December 2009.

{¶ 12} The GAL's report also discussed Mother's prior incarceration in Kansas from 1997 to 2000 on four counts of Abuse of a Child (Intentional Torture). According to the GAL, "[w]hen asked about the abuse Mother denied it but she could not give any reason, or explanation, or any other suspected party for the charges. She seemed to not believe that there was any abuse, answering the questions about the abuse with, 'well they said.' " JC 2013-2588, Doc. #89, p. 4. The report also noted that the twins had previously been in foster care in Kansas from October 2005 through December 2008, and, therefore, had spent five of the last 11 years living with someone else other than Mother.

{¶ 13} An adjudicatory hearing was held on June 21, 2013, as scheduled.

Father's attorney was present, but Father did not appear. The magistrate filed an entry shortly thereafter, on July 3, 2013. The entry noted that Father's counsel had discussed the adjudication with Father, and that Father would stipulate to dependency. JC 2013-2588, Doc. #81, p. 1; JC 2013-2587, Doc. # 86, p. 1. The order also set a permanent custody hearing for October 3 and 4, 2013. Copies of the order were sent to Father's attorney and to Father at the Kansas City address. No objections were filed to the magistrate's order, and no further appeal was taken.

{¶ 14} A semi-annual administrative review was filed with the court on July 1, 2013. The review noted that Father resided in Kansas and was reportedly not interested in involvement with the children. The review also stated that Father wanted the children brought to him.

{¶ 15} In late August, 2013, the GAL filed another report. She again noted that she had been unable to make contact with father. A copy of the report was sent to Father's attorney.

{¶ 16} On September 6, 2013, MCCS filed a motion for a reasonable efforts bypass, based on the termination of Mother's parental rights in Kansas with respect to three siblings of D.O and C.O. Attached to the motion as Exhibit 1 was a copy of a November 20, 1997 Memorandum Opinion and Journal Entry from the Juvenile Department of the District Court of Wyandotte County, Kansas. A certified copy of this journal entry was later admitted into evidence during the permanent custody hearing.

{¶ 17} The juvenile court opinion and entry involved the termination of parental rights to 10 minor children, who were living in a home with Mother and eight other adults who either lived in the home full time or visited frequently. Transcript of Proceedings,

Vol. I, Ex. 1, p. 3.   Among those children were three of Mother's children, L.O, R.O., and S.O., who were ages six years, three years, and 20 months old at the time of the termination.   The juvenile court decision, which terminated Mother's rights to the three children in her custody, further stated that:

> In the present cases involving [Mother's] children [L.O.], age 6, [R.O.], age 3, and [S.O.], age 20 months, the evidence at trial was overwhelming that they are children in need of care.

> [Mother's] treatment of L.O. was appalling.   In a statement to Det. J.B. Smith of the KCK Police Dept., she admitted handcuffing [L.O.] to the bed; shaking [L.O.] and shoving her to the floor; admitted [L.O.'s] feet were swollen and purple for three or four months, claimed not to know why and stated [other residents of the house] had also handcuffed [L.O.].

> [A resident of the house, L.R.,] related numerous instances of physical abuse of [L.O.] by [Mother].   She stated [L.O.] was tied up or handcuffed almost nightly.   She further stated that [Mother] would bend L.O.'s fingers backward and told of an incident in which [Mother] put [L.O.] behind a rocking chair on the front porch and then sat rocking it thereby forcing [L.O.'s] head to hit the wall behind her.   In addition, [L.O.] would be forced to stand in a corner of the house for hours at a time during which she would not be allowed to use the bathroom, thereby urinating and defacating [sic] on herself.   [L.R.] heard [Mother] state in reference to [L.O.], "I can't stand that little bitch, I wish she was dead" and in reference to all her children that she had kids too young and wanted to get rid of them.

Transcript of Proceedings, Vol. I, Ex. 1, p. 5.

{¶ 18} Other residents of the house testified in detail about the abuse that Mother inflicted on all the children. They stated that in addition to the abuse of L.O., Mother locked R.O. in an upstairs room to punish him and keep him out of her way, and had hit him with a board. Other residents of the house also abused L.O. After considering the evidence, which included medical documentation of the injuries to the children, the juvenile court concluded that the evidence overwhelmingly justified termination of Mother's parental rights. In this regard, the court observed that:

> Mother's attitude toward her children evidences a complete and callous disregard of her duties as a parent. This Court would consider any attempt to reintegrate children with such a mother to be an act bordering on criminal negligence. To say reintegration is not a viable alternative in this case is a gross understatement of the heinous, reprehensible and patently criminal conduct of Mother.

*Id.* at p. 9.

{¶ 19} On September 25, 2013, the GAL filed an updated report, again recommending that MCCS receive permanent custody of the children. The GAL once more noted that she had not been able to make contact with Father. A copy of the report was sent to Father's attorney. Subsequently, on September 30, 2013, the State provided Father's attorney with additional discovery.

{¶ 20} On October 16, 2013, the magistrate filed a decision and order of temporary custody concerning a dispositional hearing and motion for reasonable efforts bypass that was held on October 3, 2013. Father's attorney appeared for the hearing; Father did not

appear. The magistrate granted the motion for reasonable bypass based on the grant of permanent custody in Kansas with respect to Mother's three children. The magistrate noted that "[t]he parties do not contest the Agency's motion." JC 2013-2588, Doc. #67, p. 1; JC 2013-2587, Doc. #70, p. 1. The decision also noted that all parties were in agreement with temporary custody being given to MCCS. Doc. #67 at p. 2; Doc. #70 at p. 2. The trial judge immediately signed the order, and the parties were notified that they had 14 days to object to the decision. Copies of the order were sent to Father's attorney and to Father at the Kansas City address. No objections were filed.

{¶ 21} On October 21, 2013, MCCS filed a motion for permanent custody, claiming that an order of permanent custody was in the children's best interests. An affidavit attached to the motion indicated that Father had not had contact with MCCS and had expressed no interest in receiving custody of the children. JC 2013-2588, Doc. #66, Affidavit of MCCS Caseworker p. 2; JC 2013-2587, Doc. #69, Affidavit of MCCS Caseworker, p. 2. A copy of the motion was sent to Father's attorney. In addition, a copy of the motion and a summons, indicating that the permanent custody hearing would be held on January 23, 2014, was sent to Father by certified mail at the Kansas City address. JC 2013-2588, Doc. #64. Once again, a certified mail card signed with Father's name was returned to the court. *See* JC 2013-2587, Supplemental Summary of Docket and Journal Entries, Doc. #7.

{¶ 22} In early December 2013, the GAL filed an updated report and recommendation. The GAL's concerns continued to be the same, and the GAL again noted that she had not been able to communicate with Father. This document was sent to Father's attorney. JC 2013-2587, Doc. #65; JC 2013-2588, Doc. #61. A final pre-

trial was then held on December 13, 2013. The entry filed in connection with that hearing indicated that Father's attorney was at the pretrial. JC 2013-2587 and JC 2013-2588, Doc. #53.

{¶ 23} On January 6, 2014, MCCS filed its semi-annual review. The case review that was attached noted that Father did not have contact with the agency or the children. *Id.* at Doc. #49, Case Review, p. 3. Another GAL report was filed on January 16, 2014, again noting that the GAL had not been able to make contact with Father. As before, the GAL recommended that permanent custody be granted to MCCS, based on Mother's history, mental health status, and lack of initiative and/or ability to meet the children's needs. A copy of the report was sent to Father's attorney. *See* Doc. #40.

{¶ 24} The January 23, 2014 custody hearing was continued until late May 2014, due to the fact that MCCS had provided additional discovery. Father's counsel was sent notice of the continuance. A further GAL report filed on May 22, 2014, indicated that the GAL still had not been able to get in touch with Father. The same recommendations were made as before, and the report was sent to Father's attorney. JC 2013-2587, Doc. #26; JC 2013-2588, Doc. #27.

{¶ 25} When the case came before the court for a permanent custody hearing in late May 2014, the matter was continued to September 11, 12, and 15, 2014, because Father's attorney asked to withdraw due to a conflict with Father. JC 2013-2587 and JC 2013-2588, Doc. #22. This order was sent to Father's attorney. *Id.* New counsel was also appointed for father. *Id.* at Doc. #23.

{¶ 26} The semi-annual review form filed on June 23, 2014, indicates for the first time that Father was interested in being involved. According to the GAL, "[Father]

resides in Kansas. He resides with his parents and there is not enough room. [Father] has had some past with DUI's and past alcohol offenses. [Father] has not seen his children since they were in diapers." *Id.* at Doc. #20, Case Review attached to Semi-Annual Review Form, p. 3.

{¶ 27} In an updated report filed in September 2014, the GAL noted that she had finally been able to interview Father in May 2014. At that time, Father stated that he had not seen the children since they were in diapers. He also said he did not know where the children were until MCCS contacted him in February 2010. In addition, Father said he would like to have custody of his sons. However, the GAL noted that "[Father] for all intents and purposes, was and is a stranger to his children." *Id.* at Doc. #18, pp. 11-12.

{¶ 28} After reviewing the history of the case, including the events that have already been discussed, the GAL again recommended that the court grant permanent custody to MCCS.

{¶ 29} The trial court heard testimony on September 15, 2014, October 29, 2014, and December 5, 2014. Father did not appear for any of the permanent custody hearings, but Father's counsel appeared on his behalf and was given an opportunity to question witnesses.

{¶ 30} During the hearings, the trial judge (not the magistrate) heard testimony from the following individuals: the GAL; Dr. Julia King, a clinical psychologist who had performed psychological examinations of Mother in April 2011 and August 2013; the foster father for the twins; the caseworker who had been assigned to the case since April 2013; Mother's most recent counselor from Solutions, who had met with her on two occasions; and a property manager from Warren Metropolitan Housing Agency. Mother

did not testify.   The trial judge also conducted an in camera interview with the children.

{¶ 31} After hearing the evidence, the court filed a decision on January 27, 2015, granting permanent custody of C.O. and D.O. to MCCS.   In its decision, the court concluded that there was clear and convincing evidence, in accordance with R.C. 2151.414(E), that the children could not or would not be placed with either parent within a reasonable period of time, and there was also clear and convincing evidence under R.C. 2151.414(D) that the children's commitment to MCSS's permanent custody was in their best interests.   Father timely appealed the decision of the trial court.

## II.   Was Permanent Custody in the Children's Best Interests?

{¶ 32} Because the first two assignments of error are related, we will address them together.   Father's First Assignment of Error states that:

The Trial Court Erred in Granting Permanent Custody to Montgomery

County Children Services Because That Agency Failed to Prove By Clear

and Convincing Evidence That Permanent Custody Was in the Best Interest

of the Minor Children.

{¶ 33} Father's Second Assignment of Error states that:

The Trial Court Erred in Granting Permanent Custody to Montgomery

County Children Services Because That Agency Failed to Provide

Reasonable Efforts.

{¶ 34} Under these assignments of error, Father contends that the grant of permanent custody was not supported by sufficient evidence because reunification with Father was a possibility at the hearing held on October 29, 2014.   In this regard, Father

focuses on the fact that no home study or interstate compact was initiated to explore the possibility of placing the children with Father.

{¶ 35} "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." *In re K.W.*, 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, ¶ 15 (2d Dist.), citing R.C. 2151.414(E) and *In re J.R.*, 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. "However, the court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *Id.* "We review the trial court's judgment for an abuse of discretion." *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48.

{¶ 36} "Clear and convincing evidence is that measure or degree of proof which * * * will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. In this regard, '[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 22, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 37} "R.C. 2151.414(B) sets forth the circumstances under which a court may grant permanent custody of a child to a children services agency. Pursuant to R.C. 2151.414(B)(1)(a), the court may grant permanent custody of a child to the agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the children services agency, and 'The child is not abandoned or orphaned, has not been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, * * * and the child cannot be placed with either of the child's parent's within a reasonable time or should not be placed with the child's parents.' " *In re S.K.*, 2d Dist. Clark No. 2009 CA 29, 2009-Ohio-5533, ¶ 50.

{¶ 38} Insofar as Father's case is concerned, the trial court held that the children could not be placed with Father within a reasonable time or should not be placed with Father. R.C. 2151.414(E) contains 16 factors to be considered with respect to whether the children can be placed with the parents within a reasonable time or should be placed with the parents. Based on the trial court's findings, the factors that would apply to Father are found in R.C. 2151.414(E)(1) and (4), which provide that:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the

Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child * * *.

{¶ 39} Once a finding under R.C. 2151.414(E) has been made, the court then determines the best interests of the child. In this regard, "R.C. 2151.414(D) directs the trial court to consider all relevant factors * * * including but not limited to '(1) the interaction

and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, * * * and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child, * * *; [and](4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.' " *K.W.*, 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, at ¶ 20.

{¶ 40} In the case before us, the trial court observed that Father had no contact with the children for many years and had never supported them in any way. The court also noted that despite having had no contact, Father had expressed interest in having custody of the children, but had made no attempts to follow through or to work his case plan.

{¶ 41} These findings are supported by sufficient competent and credible evidence supporting termination of Father's parental rights. As was noted, Father had not seen the children since they were in diapers; at the time of the hearing, the twins were almost 13 years old and did not have any relationship with their father. Despite knowing the twins' whereabouts since 2010, Father made no attempt to communicate with them, and did even not ask if he could send a note or card to them.

{¶ 42} According to the caseworker, Father was very difficult to contact. When she was finally able to talk with him in the beginning of 2014, he was not interested in custody. Subsequently, Father said he was interested, but also said he could not come to court. The last time Father talked to the caseworker was in September 2014. The caseworker told Father that MCCS would have to do an interstate compact, which is a

home study. However, Father said a home study could not be done where he lived. He was staying with his mother, and there was not room enough for the children. Transcript of Proceedings, Vol. II, p. 165. Father also told the caseworker that he was not interested in working the case plan at that point in time. *Id.* In addition, Father said he did not have any relatives who could be possible placements for the children. No evidence contrary to these facts was submitted.

{¶ 43} " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15, 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." (Citation omitted.) *In re K.M.*, 12th Dist. Butler No. CA 2004-02-052, 2004-Ohio-4152, ¶ 23.

{¶ 44} Our review of the record reveals sufficient competent and credible evidence to support the trial court's finding that terminating Father's rights was in the children's best interests and that MCCS made reasonable efforts with respect to Father. An agency cannot be faulted for failing to force a home study on a party who does not want the study to be done. Furthermore, although the trial court did not make a finding that Father had abandoned his children, R.C. 2151.011(C) provides that for purposes of R.C. Chap. 2151, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." The record

indicates that Father failed to visit or maintain contact with the children for many years. Even when he knew where the children were, he did nothing.

{¶ 45} Based on the preceding discussion, the First and Second Assignments of Error are overruled.

### III. Did the Trial Court Violate Father's Due Process Rights?

{¶ 46} Father's Third Assignment of Error states that:

The Court Error [sic] in Proceeding on the Permanent Custody Request in Violation of Appellant's Procedural and Due Process Rights.

{¶ 47} Under this assignment of error, Father argues that he did not have notice of the proceedings and an opportunity to be heard. He bases this argument on the fact that the first mailing to him (of the dependency complaints) was addressed to an incorrect address.

{¶ 48} "A parent's relationship with his or her child is among the 'associational rights' sheltered by the Fourteenth Amendment to the United States Constitution against unwarranted usurpation, disregard, or disrespect by the state." (Citations omitted.) *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 17. "The fundamental requisites of due process of law in any proceeding are notice and the opportunity to be heard. It is 'flexible and calls for such procedural protections as the particular situation demands.' " (Citations omitted.) *Id.*, quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "In the context of termination of parental rights, due process requires that the state's procedural safeguards ensure that the termination proceeding is fundamentally fair." (Citation omitted.) *Id.*

{¶ 49} As a preliminary matter, we note that Father waived the due process issue by failing to object during the trial court proceedings. Specifically, after the case was filed on April 12, 2013: (1) Father stipulated to a finding of dependency at the adjudication hearing held by a magistrate on June 21, 2013, and did not thereafter either file objections or appeal from the decision; and (2) Father agreed to give MCCS temporary custody at the dispositional hearing and did not contest MCCS's motion for bypass, both of which were heard by a magistrate on October 3, 2013. Father did not thereafter either file objections to the magistrate's order or appeal. *See* JC 2013-2587, Doc. #86, p. 1 and Doc. #70, pp.1-2; JC 2013-2588, Doc. #81, p. 1 and Doc. #67, pp. 1-2.

{¶ 50} At no time did Father challenge the proceedings in the trial court, and we conclude that he has waived any objections, other than plain error. *See, e.g.*, *In re C.B.*, 2d Dist. Montgomery Nos. 24564, 24565, 24566, 2011-Ohio-4537, ¶ 9; *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 15.

{¶ 51} In *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), the Supreme Court of Ohio held that "the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Id.* at syllabus. We do not consider this such a case.

{¶ 52} We stress that we are aware of the importance of parental rights. However, the termination process was fundamentally fair to Father. Father was represented by counsel at every stage of the proceedings, including the initial shelter care

hearing that followed the filing of the dependency complaints. Furthermore, the pleadings in the case, including notices of adjudication and dispositional hearings, the motion for permanent custody, and the motion for reasonable efforts bypass, were sent to Father's attorney. In addition, the pleadings, other than the initial complaints for dependency and amended dependency complaints, were sent to Father's correct address. In this regard, we note that Father's closing argument makes a point of stating that his correct address is in Kansas City, Kansas, and that notices should be sent to that address. *See* JC 2013-2587 and JC 2013-2588, Doc. #9, p. 1. This is the address used on almost all the pleadings, and on two occasions, certified mail service to father was accepted at that address. Based on the trial court record, Father had ample notice of the proceedings and was able to adequately protect his interests.

**{¶ 53}** Accordingly, the Third Assignment of Error is overruled.

### IV. Was Trial Counsel Ineffective?

**{¶ 54}** Father's Fourth Assignment of Error is that:

Appellant's Counsel Was Ineffective.

**{¶ 55}** Under this assignment of error, Father contends that his trial counsel was ineffective because counsel failed to object to issues regarding service of the motions and complaints in this matter.

**{¶ 56}** We have previously held that "both R.C. 2151.352 and Juv.R. 4 establish a parent's right to counsel in termination proceedings." (Citation omitted.) *In re S.A.*, 2d Dist. Clark No. 07-CA-110, 2008-Ohio-2225, ¶ 8. "A parent's right to counsel arises from the guarantees of due process and equal protection contained in the constitutions of Ohio

and the United States." *Id.*, citing *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 399 N.E.2d 66 (1980), paragraph two of the syllabus. "That right to counsel includes the right to the effective assistance of trial counsel. The test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking the permanent, involuntary termination of parental custody." (Citations omitted.) *Id.*

{¶ 57} In *S.A.*, we further noted that:

In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. S*trickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. To show deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance. *Id.* The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. *Id.* Hindsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time. *State v. Cook* (1992), 65 Ohio St.3d 516, 524, 605 N.E.2d 70.

Even assuming that counsel's performance was ineffective, the defendant must still show that the error had an effect on the judgment. *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding likely would have been different. *Id.*

*S.A.* at ¶ 9-10.

**{¶ 58}** For the reasons previously stated, trial counsel was not ineffective. Even if counsel had objected, the process given to Father was fundamentally fair. Accordingly, the Fourth Assignment of Error is overruled.

## V. Conclusion

**{¶ 59}** All of Father's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, P.J. and DONOVAN, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Dylan Smearcheck
Charles W. Slicer, III
Adam Krumholz
Stephanie Allen
Richard Lipowicz
Tyler Starline
Marshall G. Lachman
Hon. Nick Kuntz